IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARLIN-GOLF, LLC, an Illinois Limited Liability Corporation; RONALD POPP, as General Partner in the Popp-Valenti Partnership and President of Arlin-Golf LLC and Individually; VICTOR VALENTI, as General Partner in the Popp-Valenti Partnership and Vice President of Arlin-Golf LLC and Individually, <br><br> Plaintiffs, <br><br> v. <br><br> THE VILLAGE OF ARLINGTON HEIGHTS, an Illinois Municipal Corporation; ARLENE J. MULDER, as Mayor of the Village and Individually; WILLIAM V. ENRIGHT, as Village Planner and Individually; BRIAN PROPERTIES, INC., an Illinois Corporation, and Individually; JACK B. WHISLER, as agent of the Village and D/B/A Brian Properties and Individually; VILLAGE BANK & TRUST, an Illinois Banking Corp. as agent of the Village and Individually; and S. MICHAEL POLANSKI, Chairman and CEO of Village Bank & Trust, Arlington Heights, and as agent of the Village of Arlington Heights and Individually, <br><br> Defendants. | No. 09 C 1907 <br><br> HONORABLE DAVID H. COAR |

## MEMORANDUM OPINION AND ORDER

This lawsuit arises from a Tax Increment Financing District ("TIF") implemented by the Village of Arlington Heights. Starting in January 2002, the Village repeatedly announced that the Arlin-Golf Shopping Center would soon be condemned pursuant to the TIF, and Arlin-Golf's tenants swiftly began to relocate. Seven and a half years later, the property still had not been

- 1 -

condemned, but Arlin-Golf LLC, and its general partners Ronald Popp and Victor Valenti, faced "financial ruin" from the lost rental income and the depressed value of their property. So they filed suit under 28 U.S.C. § 1983, alleging that the Village engaged in "sharp dealing" and "siege warfare" against their property, in violation of the Fifth and Fourteenth Amendments.

Specifically, Plaintiffs allege violations of the Equal Protection Clause (Count I), the Due Process Clause (Count II), the Takings Clause (Count III), as well as a § 1983 conspiracy (Count IV) and a claim against several defendants for "violations of well known rights" (Counts V). They also assert claims under the parallel provisions of the Illinois Constitution (Counts I-III) and supplemental state-law claims for interference with contract relations (Count VI), interference with economic expectancy (Count VII), civil conspiracy (Count VIII), breach of fiduciary duty (Count IX), and inducement of breach of fiduciary duty (Count X).

In addition to the Village, Plaintiffs have sued two Village officials, Mayor Arlene Mulder and Deputy Director of Planning and Community Development William Enright (together, the "Village Defendants"); a real estate agency by the name of Brian Properties and its principal Jack Whisler (together, the "Realtor Defendants"); and Village Bank & Trust, along with its CEO, S. Michael Polanski (together, the "Bank Defendants").

Defendants have filed three separate motions to dismiss the complaint. Plaintiffs, in turn, have filed three corresponding motions to strike Defendants' affirmative defenses of res judicata. For the reasons that follow, Plaintiffs' motions to strike are DENIED and Defendants' motions to dismiss are GRANTED. Counts I-V and X are dismissed with prejudice. Counts VI-IX are dismissed with prejudice as against the Village, and dismissed without prejudice as against all other Defendants.

# FACTS

The relevant factual allegations in the complaint, which the court must accept as true for present purposes, are as follows: Ronald Popp and Victor Valenti are the general partners of Arlin-Golf L.L.C.. (Compl. ¶¶4-7.) On June 29, 2001, the partnership purchased the Arlin-Golf Shopping Center (located at the southeast corner of Golf Terrace and Arlington Heights Road in the Village of Arlington Heights, Illinois) directly from its previous owners. (*Id.* ¶14.) At the time, the eight-store shopping center was in disrepair, with poor leases, poor tenants, and weak management; Popp and Valenti's five-year business plan was to refurbish and modernize the entire center for new tenants. (*Id.* ¶17.) Within roughly seven months of their purchase, Popp and Valenti had fully refurbished the center, had leased six of the eight stores, and were in talks with twenty one prospective tenants for the remaining two stores. (*Id.* ¶18.)

On January 22, 2002, the Village of Arlington Heights announced the creation of a new Tax Increment Financing District ("TIF" No. 4). (*Id.* ¶ 19.) Since the Arlin-Golf Shopping Center was within the TIF's proposed redevelopment area, the Village announced that the center would be condemned, knocked down, and redeveloped in about six months. (*Id.* ¶¶19-20.) The TIF was implemented by ordinance in June 2002. (*Id.* ¶19.) At that time, the Village had no specific redevelopment plan for the center, and the first plan to be put on the table—opening a Super Target retail store in its place—fell through when Target cancelled its agreement with the Village. (*Id.* ¶21.) Subsequently, the TIF plan was "further altered" without any hearings being held. (*Id.*) Whatever the plan for redevelopment, the Village repeatedly announced that the center would be demolished within sixty to ninety days. (*Id.* ¶33.)

Arlin-Golf suffered financially from the announcement of the condemnation. All told, Popp and Valenti lost well in excess of five million dollars. (*Id.* ¶¶61-63.) As tenants began to

lose business (*id.*), they abandoned the center by breaking their leases or failing to renew their leases. (*Id.* ¶22.) One tenant, Happiness is Pets, moved across the street to another location, paying double the rent it was paying to Arlin-Golf. (*Id.* ¶34.) Salon College Hairdressers was unable to attract more hairdressers, lost clientele, and eventually moved. (*Id.* ¶35.) The Village paid Bangkok Café, one of Arlin-Golf's tenants, $35,000 to move to downtown Arlington Heights, allegedly because it was the Mayor's favorite Thai restaurant. (*Id.* ¶22.) Arlin-Golf's losses were exacerbated by the escalation clauses for future rentals in these leases. (*Id.* ¶31.) And all twenty one prospective tenants lost interest in renting the remaining stores. (*Id.*)

However, the Village failed to follow through on the announced condemnation and demolition for seven and a half years. (*Id.* ¶36.) During that time, Arlin-Golf had to shoulder expenses of over $15,000/month to carry the center, which could not be rented, used, or sold while subject to the TIF. (*Id.* ¶¶36, 38-40.) By spreading "false information" that the center had been condemned and would soon be demolished—and by engaging in other "siege warfare"— the Village "dissuaded" and "discouraged" prospective tenants and "convinced" them to move elsewhere, leaving Arlin-Golf with heavy losses. (*Id.* ¶¶36, 41.)

On February 1, 2006, Popp received a letter from William Enright, Deputy Director of Planning and Community Development for the Village, informing him that a Redevelopment Agreement concerning the property would be signed with a developer within two weeks. (*Id.* ¶43.) Popp and Valenti asked to be considered in the redevelopment. (*Id.* ¶44.) Then in 2008, "facing personal and business financial ruin," they decided to try to sell the center through a commercial real estate broker. (*Id.* ¶45.) They contacted Brian Properties, Inc. and signed a realty listing agreement with agent Scott Whisler on June 6, 2008. (*Id.* ¶47.) The asking price for the property was $2,250,000, with a 5% sales-commission agreement. (*Id.*)

On July 3, 2008, Jack B. Whisler ("Whisler"), the owner of Brian Properties, presented a second listing agreement in which he listed himself as the broker for the property. (*Id.* ¶48.) Under the terms of the second agreement, Whisler would receive a 20% sales commission on any amount over $1,400,000 if the center was sold to the Village. (*Id.*) When Valenti refused to sign, Whisler insisted that Valenti be excluded from any negotiations. (*Id.*) Both agreements included "dual agency consent and disclosures." (*Id.*)

Around the same time, "in desperation," Arlin-Golf tried to rent a store in the center to Arlington Pet Clinic. (*Id.* ¶50). The Village denied the necessary permits and told the Clinic—again, falsely—that the Village already owned the property on which the center sits. (*Id.*)

Meanwhile, Arlin-Golf had obtained two appraisals of the property from real estate appraisers in summer 2005 and August 2007, for $1,950,000 and $2,000,000 respectively. (*Id.* ¶51.) The Village had obtained its own appraisal "for between $1,300,000 and $1,600,000" and expressed an interest in purchasing the center in mid-2008. (*Id.* ¶52.) This appraisal was not available to Arlin-Golf under FOIA, and the Village would not show it to them. (*Id.* ¶¶52-53.) However, Whisler met first with the Trustees of the Village and then with Mayor Arlene Mulder to review the appraisal, and he then sent his son Scott to make a handwritten copy of it. (*Id.*)

When Whisler met with Popp on September 22, 2008, he told Popp that Arlin-Golf would accept the Village's offer "or else." (*Id.* ¶54.) Specifically, Village Bank & Trust would immediately foreclose on the primary mortgage on the center, a loan against a second shopping center owned by other partners of Popp in another limited partnership, and the mortgages on Popp and Valenti's homes. (*Id.*) The bank would then sell the center to the Village for $800,000 and "force" Popp and Valenti to "pay the difference." (*Id.* ¶54.) Whisler also said that if they accepted the Village's deal, they would not have to pay him the $40,000 he "otherwise

demanded." (*Id.*)  When Popp told Whisler that he had an attorney who thought he could negotiate a sale of the center for $2,000,000, Whisler told Popp "to call the attorney off or the Village Attorney 'will slit your throat.'"  (*Id.* ¶55.)

Shortly after his meeting with Whisler, Popp received a call from Todd Birch of the Village Bank &Trust, demanding that Popp go immediately to the bank to meet with S. Michael Polanski, Chairman and CEO of the bank.  (*Id.* ¶56.)  When Popp arrived, Polanski "ranted, raved and shouted" that if Arlin-Golf did not accept the Village's offer of $1,600,000, he would immediately foreclose on everything Popp and Valenti owned and obtain the center for the Village for $800,000.  (*Id.*)  Birch said that if Popp and Valenti accepted the offer, they would not have to pay "the $40,000 commission" (presumably the sales commission to Whisler, though the complaint does not say).  (*Id.*)

Enright falsely told William Dixon, the Village Manager, that Popp and Valenti had purchased the center after being told about the TIF, in order to "jack up the sales price to the Village" and "take advantage of the Village."  (*Id.* ¶58.)  Dixon conveyed this false information to the Village Board members.  (*Id.*)  In truth, not only did Arlin-Golf purchase the center before the announcement of the TIF, Popp and Valenti had "asked Village staff if there would be any such activity upon the property and were told 'no.'"  (*Id.* ¶59.)

## **LEGAL STANDARD**

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), that is, "a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) (*Twombly* applies to "all civil actions").  This requirement imposes two relatively low

hurdles. *First*, a complaint "must describe the claim in sufficient detail to give the defendant 'fair notice of what the claim is and the grounds upon which it rests.'" *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1964). *Second*, the allegations "must plausibly suggest that the defendant has a right to relief, raising that possibility above a 'speculative level.'" *Concentra*, 496 F.3d at 776. If the allegations do not suggest a right to relief—if for instance, a plaintiff relies merely on conclusions, labels, or formulaic recitations of the elements of a cause of action—a Rule 12(b)(6) motion should be granted. *Twombly*, 550 U.S. at 570.

## ANALYSIS

### *Federal Claims (Counts I-V)*

Defendants have all moved to dismiss the complaint as barred by res judicata. In 2006, Arlin-Golf LLC filed suit against the Village in the Chancery Division of the Circuit Court of Cook County (Case no. 06 CH 7831), alleging, in substance, that the Village's implementation of TIF No.4 was illegal under state law and caused Arlin-Golf substantial economic harm. Arlin-Golf sought declaratory and injunctive relief for violations of the Tax Increment Allocation Redevelopment Act, *see* 65 ILCS 5/11-74.4-1 *et seq*, or in the alternative, just compensation for a constructive taking under state law. *See* ILL. CONST. art. I, § 15 ("Private property shall not be taken or damaged for public use without just compensation as provided by law."). Arlin-Golf and the Village eventually settled, agreeing on a price of $1,6000,000 for the disputed property. On September 18, 2008, Arlin-Golf voluntarily dismissed the suit with prejudice. Defendants now argue that the preclusive effect of the state-court suit mandates dismissal of the present complaint in its entirety.

As an initial matter, Plaintiffs have moved to strike the affirmative defense of res judicata

as, among other things, improperly raised in a Rule 12(b)(6) motion and therefore "waived."[1] True, res judicata is not among the affirmative defenses that Rule 12, on its face, permits to be made by motion rather than responsive pleading. *See* Fed. R. Civ. P. 12(b). "But when an affirmative defense is disclosed in the complaint, it provides a proper basis for a Rule 12(b)(6) motion," since "[n]o purpose would be served by compelling the defendant to file an answer rather than proceeding by motion when the plaintiff has pleaded the answer himself." *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008). This principle applies to res judicata. *See id.* Moreover, the court may consider exhibits attached to a complaint when ruling on a Rule 12(b)(6) motion; thus, "a plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645 (7th Cir. 2006) (quotation marks and citation omitted).

Here, Plaintiffs attached, as exhibits to their complaint, (i) several pages of their state-court complaint (Compl. Ex. H); (ii) a letter from Village Manager Bill Dixon confirming the Village's oral offer to purchase the Center for $1,600,000 and setting forth, as a condition of the offer, that "[t]he lawsuit filed by Arlin-Golf LLC against the Village of Arlington Heights must be withdrawn with prejudice" (*Id.* Ex. T4); (iii) a letter from Popp and Valenti to Dixon, captioned "Settlement Proposal," accepting the Village's offer (*Id.* Ex. T6). Since the basis for an affirmative defense of res judicata was disclosed in the complaint and its accompanying exhibits, Defendants were not obliged to file an answer in order to assert an affirmative defense that Plaintiffs had, in effect, already pleaded for them.

---

[1] Plaintiffs also argue that all res judicata defenses should be stricken for violating Local Rule 7.1, since Defendants, in their three separate motions to dismiss, say that they "adopt" each others' arguments in favor of dismissal. Plaintiffs therefore reason that each defendant should be charged with having submitted *all* the materials submitted in connection with *all* motions to dismiss, which naturally exceeds the fifteen-page limit. The court declines to discuss this frivolous argument in any detail. It suffices to say that each brief is within the fifteen-page limit, adequately asserts an affirmative defense of res judicata on its face, and discusses the application of preclusion law to the relevant Defendants. Thus, the alleged violation of Local Rule 7.1 is specious.

The preclusive effect of a state court's judgment on a subsequent suit in federal court is determined by state law. *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 471 (7th Cir. 2007); *see also* 28 U.S.C. § 1738. Under Illinois law, three requirements must be satisfied for res judicata to bar a subsequent claim: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies." *Nowak v. St. Rita High Sch.*, 757 N.E.2d 471, 477 (Ill. 2001). Res judicata bars not only claims that were actually raised in the prior proceeding, but also claims that could have been raised in the prior proceedings. *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 889 (Ill. 1998).

*First*, the state-court settlement operates as a final judgment on the merits for purposes of res judicata, notwithstanding Plaintiffs' observation that the state-court suit "was dismissed by Plaintiffs not the court." Under Illinois law, a voluntary dismissal with prejudice pursuant to a settlement agreement operates as a final judgment on the merits that is entitled to full res judicata effect. *See 4901 Corp. v. Town of Cicero*, 220 F.3d 522, 529 (7th Cir. 2000) (applying Illinois law and collecting Illinois cases). As such, it is conclusive with respect to any claim that could have been raised in the state-court suit. *Arnett v. Envtl. Sci. & Eng'g, Inc.*, 657 N.E.2d 668, 673 (Ill. App. Ct. 1995). Plaintiffs further contend that the state-court settlement was not a dismissal on the merits because it was based on "gun to the head duress," but they fail to provide any authority for their assertion that the alleged circumstances of this case would remove the preclusive effect of the state-court settlement. They do not, for instance, allege that they were deprived of a full and fair opportunity to litigate their claims in state court. *See, e.g.*, *Hicks*, 479 F.3d at 471. The state-court settlement is therefore a final judgment on the merits.

*Second*, despite the abundance of new claims in the present suit, there is an "identity of

causes of action." Under Illinois' so-called transactional test, "separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts," or, put differently, "from the same transaction." *River Park*, 703 N.E.2d at 893. The mere addition of new theories of relief in a subsequent suit arising from the same operative facts will not create a new cause of action. *Id.* at 894-95. In the present suit, Plaintiffs have added a multitude of new legal theories, but the operative facts are the same as in the state-court suit: the implementation of TIF No.4 by the Village and the economic harm to Arlin-Golf LLC and its principals that allegedly came from it. So there is no reason why Plaintiffs could not have brought their new claims in the initial state-court suit. For instance, the state-court suit asserted a claim for a constructive taking under the eminent-domain provision of the Illinois Constitution. There is no reason why a takings claim under the United States Constitution—or for that matter, the equal protection or substantive due process arguments that relate to the same alleged interference with Arlin-Golf's property—had to wait until a second suit in federal court. Such is the bite of preclusion law: "once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or be lost." *Andersen v. Chrysler Corp.*, 99 F.3d 846, 852 (7th Cir. 1996). Plaintiffs have failed to heed that principle.

In response, Plaintiffs contend that any preclusive effect of the state-court settlement is limited to conduct or damages that already existed when the state-court suit was filed in 2006. Plaintiffs do not explain the import of this assertion, but perhaps their point is that the allegations of sharp dealing by various Defendants in bringing about the settlement, which seem to form the basis for some of their present claims, are beyond the reach of the settlement's preclusive effect. This is incorrect. "It is well established that the facts as they exist at the time of judgment determine whether res judicata bars a subsequent action." *Altair Corp. v. Grand Premier Trust*

*& Inv.*, 742 N.E.2d 351, 355 (Ill. App. Ct. 2000). Thus, Plaintiffs' claims in the present case would have to arise from an injury Plaintiffs suffered, or from actionable conduct Defendants engaged in, sometime after the state-court case was settled in September 2008. They do not.

*Third*, despite the abundance of new parties in the present action, they are all—subject to some qualifications explained below—in privity with the parties to the prior state-court action. To begin with, Arlin-Golf LLC was the only plaintiff in the state-court action. But for purposes of res judicata, "[l]imited liability companies ("LLCs") are in privity with their individual owners . . . ." *Kramer v. Stelter*, 588 F. Supp. 2d 862, 867 (N.D. Il. 2008). This is not surprising, given the close alignment of the interests of an LLC like Arlin-Golf with the interests of its two owners, Popp and Valenti. Indeed, Popp and Valenti allege "personal and business financial ruin" from the financial havoc the Village allegedly wrought with Arlin-Golf. Next, the Village was the only named defendant in the state-court suit. At a minimum, then, there can be no dispute that the settlement precludes any claims against the Village that could have been raised in state court. But the preclusive effect of the settlement also extends to any party in privity with the Village.

With respect to the Realtor and Bank Defendants, Plaintiffs are in a bind of their own making: real estate agencies, banks, and their officers do not normally act under color of state law and are therefore not normally amenable to suit under § 1983. But a private party who acts at the behest of a governmental body may, at least in some circumstances, act under color of state law. Thus Plaintiffs take great pains to allege that the Realtor and Bank Defendants acted as agents of the Village, and even fashioned some novel captions to their lawsuit to reflect this alleged capacity. By repeatedly and unequivocally pleading this alleged agency relationship, Plaintiffs bound themselves to their judicial admissions; this is the basis of the principle that a

party can plead itself out of court. *See Soo Line R.R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997). Such is the case here, as an agent is in privity with its principal for purposes of res judicata—including when the alleged principal is a municipality. *See Garcia v. Vill. of Mt. Prospect*, 360 F.3d 630, 637 (7th Cir. 2004) (preclusive effect of prior suit against municipality extends to agents named in subsequent suit). Thus, to the extent that the Realtor and Bank Defendants are alleged to have acted as "agents" of the Village—as in Counts I-IV—the state-court settlement precludes suit. And to the extent that they are sued not as "agents" of the Village but merely as the private parties that they are—as in Count V—a § 1983 claim would fail for want of state action. *See Case v. Milewski*, 327 F.3d 564, 566 (7th Cir. 2003) ("To state a claim under § 1983 a plaintiff must allege . . . [that] the conduct complained of was committed by a person acting under color of state law."). Either way, all of Plaintiffs' § 1983 claims against the Realtor and Bank Defendants (Counts I-V) fail.

As officers of the Village, Mulder and Enright, too, are in privity with the Village—at least to the extent they are sued in their official capacity. *Connor v. Reinhard*, 847 F.2d 384, 394 (7th Cir. 1988) ("[A] city official sued in his official capacity is generally in privity with the municipality."); *see also Garcia*, 360 F.3d at 636 (employees of police pension board in privity with municipality). But a government official sued in his or her individual capacity is not in privity with the government for purposes of res judicata. *Connor*, 847 F.2d at 395. Thus, res judicata does not bar Count V as against Defendants Mulder and Enright.

Mulder, however, enjoys absolute immunity from suit under § 1983 for any acts she performed as a local legislator. *See Bogan v. Scott-Harris*, 523 U.S. 44 (1998). Whether a city official's act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* at 54. For instance, voting for a local ordinance is a legislative

act, regardless of why a city-council member votes as she does—and that includes retaliation against a plaintiff for exercising her First Amendment rights. *Id.* at 55. The same goes for a mayor's act of signing a local ordinance into law, or, for that matter, proposing a city budget. *Id.* More generally, an act by a local executive official that reflects a "discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents" is a legislative act that is entitled to absolute immunity. *Id.* at 55-56.

As mayor of a home-rule municipality with a managerial form of government, Mulder is the presiding member of the legislative body and may vote on all questions coming before the city council. *See* 65 ILCS 5/5-3-2. Voting for the TIF was thus a legislative act well within her authority as mayor. And any further involvement in the implementation of the TIF certainly implicates "discretionary, policymaking decision[s]" involving the disposition of Village resources. *See Bogan*, 523 U.S. at 55. For these acts, Mulder is absolutely immune from suit under § 1983. *See id.*

Beyond her official participation in creating the TIF, Plaintiffs' only allegations against Mulder are as follows: with the help of her friend Whisler, she forced a local developer to sell her a house worth $2,000,000 for $1,200,000 (Compl. ¶ 64); she "pushed through a multi-million dollar city hall redevelopment that gave her a palatial office with a very large outdoor balcony for lavish evening entertainment, at taxpayer expense" (*Id.* ¶ 65); her favorite Thai restaurant in Arlington Heights is Bangkok Café. (*Id.* ¶ 22.) Standing problems aside, these allegations fail to state a claim against Mulder for "purposeful violations of well known [constitutional] rights." There is no basis for liability against Mulder in Count V.

Nor do Plaintiffs adequately allege any violation of their constitutional rights by Enright, the Deputy Director of Planning and Community Development for Arlington Heights. Enright

figures in only two factual allegations in the complaint: *first*, in February 2006, Enright sent a letter to Popp informing him "that within two weeks, a Redevelopment Agreement would be signed with a developer regarding the Subject Property" (Compl. ¶ 43.); *second*, Enright "falsely and knowingly lied and told the Village Manager . . . that the Partners [i.e., Popp and Valenti] had bought the Arlin-Golf Center <u>after</u> being told about the TIF and had purchased the Center to jack up the sales price to the Village, to take advantage of the Village." (Compl. ¶ 58.) There is simply no constitutional violation alleged here, so Count V fails with respect to Enright. And that disposes of all federal claims against all Defendants, as well as the corresponding claims under the parallel provisions of the Illinois Constitution in Counts I-III.

*State-law Claims (Counts VI-X)*

"When the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008). When it is "clearly apparent how the state claim is to be decided," however, a district court may retain supplemental jurisdiction. *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also* 28 U.S.C. § 1367(c)(3).

It is "clearly apparent" that all state-law claims against the Village are barred by the preclusive effect of the state-court settlement. For reasons already discussed, the claims in the present complaint all "arise from a single group of operative facts," *see River Park*, 703 N.E.2d at 893, and the Village was the named defendant in the state-court suit. Counts VI-X are accordingly dismissed as against the Village. Since the Village is the only defendant named in Count X, that count is dismissed in its entirety.

Res judicata, however, applies to Mulder and Enright only to the extent that they are sued in their official capacities, *see Connor*, 847 F.2d at 395, and official-capacity suits are a creature

of § 1983, not state common-law actions. Thus, with respect to Counts VI-IX, Mulder and Enright are not in privity with the Village, and these claims cannot be dismissed on grounds of res judicata. Furthermore, res judicata extends to the Realtor and Bank Defendants only to the extent that Plaintiffs allege that these Defendants acted as "agents" of the Village, for only then would they be in privity with the Village. But Counts VI-IX appear to plead ordinary state-law claims against ordinary private-party defendants, and in that context, such agency allegations would serve no discernible purpose. Thus, it is not "clearly apparent" that Counts VI-IX can be dismissed on grounds of res judicata as against the Realtor or Bank Defendants. At this juncture, then, these claims are most appropriately heard by the state courts. *See Leister*, 546 F.3d at 882. The court relinquishes supplemental jurisdiction over Counts VI-IX, as against the Realtor and Bank Defendants. If Plaintiffs wish to pursue these claims against these Defendants, they will have to do so in state court.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions to strike are DENIED and Defendants' motions to dismiss the complaint are GRANTED. Counts I-V and X are dismissed with prejudice. Counts VI-IX are dismissed with prejudice as against the Village of Arlington Heights, and dismissed without prejudice as against all other Defendants.

Enter:

/s/ David H. Coar

David H. Coar

United States District Judge

**Dated: March 9, 2010**